UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

L.P.O.E., Inc., a Minnesota Corporation;
Down In the Valley, Inc., a Minnesota Corporation;
Disc and Tape, Inc., a Minnesota Corporation; and,
Hideaway LLC. a Minnesota Corporation,

Plaintiffs,                                    **PLAINTIFFS' REPLY TO
                                               GOVERNMENT'S
                                               OPPOSITION TO
                                               GRANTING THE TRO**

vs.                                            Case No. <u>0:10-CV-04944-PJS-LIB</u>

The United States Drug Enforcement Administration,
U.S. Department of Justice; and its
Deputy Director, D.E.A., Michele M. Leonhart

Defendants.

Plaintiffs, four individual retail merchants, will request permission of the Court to

Amend the Complaint to include an additional Plaintiff, Midwest Botanical, a Minnesota

LLC which manufactures materials subject to the proposed "Temporary Rule".

Plaintiffs supply additional affidavits and state, as an additional basis for relief, the

Declaratory Judgment Act, 28 U.S.C.A. § 2201 [1] .

_____

[1] The Complaint already requests "Declaratory Judgment" and Jurisdiction is invoked
under the "Federal Question" jurisdiction (Section 1331) so Defendants' suffer no
prejudice due to lack of notice.

# I.

## PROCEDURAL INTRODUCTION

On November 24, 2010, the Drug Enforcement Administration (hereinafter "DEA"), a division of the Department of Justice (hereinafter "DOJ")  issued a "Notice of Intent To Temporarily Schedule" five substances as "Schedule 1" controlled substances suddenly announcing  that there was an "imminent hazard" to the public[2] if they did not proceed according to a narrow exception to the traditional rule making procedures set forth in the Administrative Procedure Act and that they were complying with various other federal statutes; and in a simultaneous press release announced that they would be issuing the "final temporary order" anytime 30 days thereafter.

On December 21, 2010, Plaintiffs filed a Declaratory Judgment law suit, citing a violation of the Constitution's "Due Process Clause" under the 5th Amendment, with a motion and affidavit challenging the DEA's pharmacological pronouncements, and requesting that this Court issue an Injunction to require the DEA to do more than merely recite a mantra, without any scientific proof to back up their opinion, before turning hundreds of thousands of Americans into felons overnight and destroying thousands of small businesses, while simultaneously depriving States of sales taxes and both State and

---

[2] The Comprehensive Crime Control Act of 1984 (Pub. L. 98-473), which was signed into law on October 12, 1984, amended section 201 of the CSA (21 U.S.C. 811) to give the Attorney General the authority to temporarily place a substance into Schedule I of the CSA for one year without regard to the requirements of 21 U.S.C. 811(b) if he finds that such action is necessary to avoid imminent hazard to the public safety.

Federal Government of income taxes; and immediately throwing thousands more Americans onto the unemployment lines.

In its initial filing the DEA proclaimed that their proposed "temporary" rule did not have significant financial impact upon small business entities, and that they complied with the Congressional Review Act(hereinafter "CRA") , the Regulatory Flexibility Act (hereinafter "RFA"), and Executive Orders (Presidential decrees); nevertheless ignoring Executive Order 12866[3]

The DEA was initially required to have its answer and response to Plaintiffs' motion filed with the Court on January 6, 2011, but requested and was granted an extension to January 13th.

The DEA used the extension time to issue another Notice, dated January 7, 2011 and published January 13, 2011 claiming an "administrative error" and pronounced

---

[3] In pertinent part, President Clinton ordered, in 1993 that:   **Section 1.** *Statement of Regulatory Philosophy and Principles. (a) The Regulatory Philosophy.* Federal agencies should promulgate only such regulations as are…made necessary by compelling public need,…to protect or improve the health and safety of the public…. In deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating. (b) *The Principles of Regulation….* (7) Each agency shall base its decisions on the best reasonably obtainable scientific, technical, economic, and other information concerning the need for, and consequences of, the intended regulation. **Section 3**. (d)(1) "Regulation" or "rule" means an agency statement of general applicability and future effect, which the agency intends to have the force and effect of law, that is designed to implement, interpret, or prescribe law or policy or to describe the procedure or practice requirements of an agency. It does not, however, include:   (1) Regulations or rules issued in accordance with the formal rulemaking provisions of 5 U.S.C. 556, 557;[regular proceedings through the Administrative Procedure Act]…" This Executive Order is a note in  5 U.S.C.A. § 601. Limiting amendments to it were revoked by President Obama in **Exec. Order No. 13497, January 2009**

without citing any legal authority, that they did not have to address either the CRA or

RFA,[4] thus "amending" (when faced with affidavits at odds with this recent

"clarification") the original November 24, 2010 Notice. [5]

In their brief, filed on January 13, 2011 the DEA argues that the true science

doesn't matter, only the opinion of the DEA Administrator, and relying upon a case

decided two decades ago, *Touby v. United States*,[6] 500 US 160 (1991) proclaims that

---

[4]   In marked contradistinction **with all of the last times** the DEA "Temporarily" (albeit labeling same as "final rules" when issued") scheduled a substance under 21 U.S.C. 811 (h).  ***See, e.g.*** : **(1)** Federal Register Vol. 67, No. 138 : "Temporary Placement of Benzylpiperazine and Trifluorormethyphenylpiperazine into Schedule 1 @ http://www.gpo.gov/fdsys/pkg/FR-2002-07-18/pdf/02-17901.pdf;; **(2)** Federal Register Vol. 67, No. 138 , Temporary Placement of 2,5-Dimethoxy-4-(n)-propylthiophenethylamine Into Schedule I, @ http://www.gpo.gov/fdsys/pkg/FR-2002-07-18/pdf/02-17902.pdf; **(3)** Federal Register Vol. 68, No. 18 , Temporary Placement of Alphamethyltryptamine and 5-methoxy-N,Ndiisopropyltryptamine Into Schedule I @ http://www.gpo.gov/fdsys/pkg/FR-2003-01-28/pdf/03-1800.pdf; **(4)** Federal Register Vol. 67, No. 183; Temporary Placement of 2,5-dimethoxy-4-(n)-propylthiophenethylamine Into Schedule I @ http://www.gpo.gov/fdsys/pkg/FR-2002-09-20/pdf/02-23877.pdf

[5] In *Alameda County **Medical Center** v. **Leavitt** ,*559 F.Supp.2d 1,D.D.C.,2008., the Honorable District Court Judge James Robertson framed the issue thusly:   "**In this case, the Court is asked to decide whether a maneuver by the Executive Branch deliberately designed to outfox a  clear directive of Congress was successful. The answer is no.**"  In *Leavitt*, as in the case at bar, the question presented is whether [the Secretary] took "***any action ...*** to finalize or otherwise implement" the rule***(emphasis added).***

[6]   The *Touby* court held that the statute authorizing the Attorney General to schedule controlled substances on a temporary basis does not violate  the nondelegation doctrine. ***There was <u>no</u> "Due Process" argument*** presented by the Appellant or considered by the Court,  nor did *Touby* consider the 1986 Analogue Act which addressed all of  the evils relied upon in the reasoning in  *Touby*

there are no legitimate legal issues in contention; mere recitation of "intelligible

principles" are enough, there does not need to be any scientifically established support for

the DEA's action, and if there were, the matter is not "ripe" for judicial intervention.

## II.
## ARGUMENT

   **It is well-established that the "[p]laintiffs ... are not required to expose themselves to arrest or prosecution under a criminal statute in order to challenge a statute in federal court."** *Arkansas Right to Life State PAC v. Butler,* **146 F.3d 558, 560 (8th Cir.1998). Rather, "[w]hen government action or inaction is challenged by a party who is a target or object of that action, as in this case, 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.' "** *Minnesota Citizens Concerned for Life v. Fed. Election Comm'n,* **113 F.3d 129, 131 (8th Cir.1997) (quoting** *Lujan v. Defenders of the Wildlife,* **504 U.S. 555, 561-62, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).**


   Much has been written about our Constitution over the past 230 years.   All

Americans agree that the yoke of the King was thrown off and a new society was born

with the Declaration of Independence.  How that society would live was fashioned into

the United States Constitution.

   Since written, there have been two schools of thought regarding its words. Over

the past century, Justices labeled, "Strict Constructionists" insist that the words are

sacrosanct and all legal solutions flow therefrom. [7] Other Justices who view the

---

[7]  Ten years after *Touby,* Justice Clarence Thomas, in his concurring opinion in *Whitman v. American Trucking Associations* 531 U.S. 457, 121 S.Ct. 903 U.S., 2001 noted that: "The parties to these cases who briefed the constitutional issue wrangled over constitutional doctrine with barely a nod to the text of the Constitution.  Although this Court since 1928 has treated the "intelligible principle" requirement as the only

Constitution as a living document,  argue that Congress could not have anticipated all of

the changes that would beset the world, thus while the Constitution remains the bedrock,

new situations call for new interpretations.

Plaintiffs humbly assert that both intellectual schools of thought lead to the same

conclusion.  The DEA must be stopped from hitting a bureaucratic button that instantly

turns tens of thousands of law abiding, tax (income and sales) paying merchants and the

hundreds of thousands of their customers into felons while simultaneously destroying

tens of thousands of small businesses and putting many more thousands into

unemployment.   Due Process of the Law is required.

Where Congress intends to preclude judicial review of ***constitutional claims*** its

intent to do so must be clear. *E.g., Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047,

100 L.Ed.2d 632. (1988) wherein the Supreme Court stated: "We emphasized in *Johnson*

---

constitutional limit on congressional grants of power to administrative agencies, see *J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624 (1928), the Constitution does not speak of "intelligible principles." Rather, it speaks in much simpler terms: "All legislative Powers herein granted shall be vested in a Congress." U.S. Const., Art. 1, § 1 (emphasis added). ***I am not convinced that the intelligible principle doctrine serves to prevent all cessions of legislative power. I believe that there are cases in which the principle is intelligible and yet the significance of the delegated decision is simply too great for the decision to be called anything other than "legislative."*** As it is, none of the parties to these cases has examined the text of the Constitution or asked us to reconsider our precedents on cessions of legislative power. ***On a future day***, however***, I would be willing to address the question whether our delegation jurisprudence has strayed too far from our Founders' understanding of separation of powers. (emphasis added)***

*v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), that where Congress

intends to preclude judicial review of constitutional claims its intent to do so must be

clear. *Id., at 373-374, 94 S.Ct., at 1168-1169.* In *Weinberger v. Salfi,* 422 U.S. 749, 95

S.Ct. 2457, 45 L.Ed.2d 522 (1975), we reaffirmed that view. We require this heightened

showing in part to avoid the "serious constitutional question" that would arise if a federal

statute were construed to deny any judicial forum for a colorable constitutional claim. *See*

*Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 681, n. 12, 106 S.Ct.

2133, 2141-42 n. 12, 90 L.Ed.2d 623 (1986)."

    The difference between the parties , as stated by the government in their brief, is

"What due process is required"?  Relying upon *Touby,* the government correctly points

out that two decades ago the US Supreme Court, facing what was then described as a

psychedelic world gone awry, took action to keep clever chemists from getting "around"

the law by manipulating molecules to "beat" a legal definition, while boldly enabling

citizens to "get high" without legal consequences.   That goal, stated clearly in *Touby,*

while noble, is no longer relevant under the statutory scheme existing today.  The risk

*Touby* addressed is already thwarted, with the adoption of a subsequent Act of Congress,

the Controlled Substance Analogue Enforcement Act of 1986  which provides that, to the

extent that a controlled substance analogue is intended for human consumption, it is to be

treated as a schedule I controlled substance for purposes of any federal law. The Act was

designed to combat the problem of persons who seek to avoid the reach of federal

criminal drug laws by manufacturing or distributing substances that are not listed as

controlled substances, but which are specifically designed to provide effects that are substantially similar to the effects of listed substances.

What remains, therefore, is the same Question raised by the government: What Process is due?

The parties differ, however, in their answer; and considering the great danger to individual liberty and property rights that the government, who has stated its intention to act, in a definite matter with definite results on the one hand, and the alleged "imminent hazard" looming on the other hand, can and should be resolved by the judiciary.   The "general federal questions" basis for jurisdiction is sufficient, now, for the Declaratory Judgment whether government is threatening the Constitutional Rights of its citizens with dire consequences; and sufficient legal safeguards are already in place to maintain the "status quo" while the Government researches whether its opinion is supported by facts derived from the scientific method of analysis, not thrown forward by the Fourth Estate or "gathered" from the internet. The answer, as to what is the process that is "due", and for reasons set forth more fully below,   starts with a federal district court judge under the unique circumstances surrounding the DEA's threatened action.


### (i)  RIPENESS AND JURISDICTION

In ***MedImmune, Inc. v. Genentech, Inc.***, 549 U.S. 118, 127 S.Ct. 764, U.S., 2007 the Supreme Court stated:

> "The justiciability problem that arises, when the party seeking declaratory relief is himself preventing the complained-of injury from occurring, can be described in

terms of standing (whether plaintiff is threatened with "imminent" injury in fact " 'fairly ... trace[able] to the challenged action of the defendant,' " *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)), or in terms of ripeness (whether there is sufficient "hardship to the parties [in] withholding court consideration" until there is enforcement action, *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

"Our analysis must begin with the recognition that, where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat-for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.  For example, in *Terrace v. Thompson,* 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255 (1923), the State threatened the plaintiff with forfeiture of his farm, fines, and penalties if he entered into a lease with an alien in violation of the State's anti-alien land law. Given this genuine threat of enforcement, we did not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action. (cites omitted)   Likewise, in *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), we did not require the plaintiff to proceed to distribute handbills and risk actual prosecution before he could seek a declaratory judgment regarding the constitutionality of a state statute prohibiting such distribution. *Id., at 458-460, 94 S.Ct. 1209.* As then-Justice Rehnquist put it in his concurrence, "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity." *Id., at 480, 94 S.Ct. 1209.* In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do (enter into a lease, or distribute handbills at the shopping center). That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced. See  *Terrace, supra,* at 215-216, 44 S.Ct. 15; *Steffel, supra,* at 459, 94 S.Ct. 1209. The dilemma posed by that coercion-putting the challenger to the choice between abandoning his rights and risking prosecution-is "a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Abbott Laboratories*.

"The Declaratory Judgment Act provides that a court "may declare the rights and other legal relations of any interested party," 28 U.S.C. § 2201(a) (emphasis added), not that it *must* do so. This text has long been understood "to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 286, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995); (cites omitted). We have found it "more consistent with the statute," however, "to vest district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *Wilton, supra,* at 289, 115 S.Ct. 2137;

This Court should exercise its discretion in favor of proceeding because the "stakes" herein, complete destruction of thousands of lawful businesses and felony prosecution of hundreds of thousands of citizens, while simultaneously depriving states of needed sales and income taxes is different, on the facts, then those cases cited by the Government.  The Government's argument that Courts and citizens should "wait" until they wake up one morning and read the Federal Register, to learn that the DEA and other law enforcement officers  are sweeping the country and arresting people, is un-American.

Forcing those victims of prosecution, who then can only try, in hundreds or thousands of state[8] and federal courts throughout the country to mount a collateral attack on the scheduling process does not seem the most efficient use of judicial time, and is likely to lead to conflicting and/or contradicting opinions which then flood the appellate courts while citizens remain behind bars.   All of this is what should happen, sayeth the DEA, without doing anything other than repeating unsubstantiated rumors and asserting simply that there is an "imminent" public health safety issue which justifies "immediate" "temporary" scheduling.

What "process is due" under the temporary scheduling provision according to the government? A mere 30 day "notice" (which also begs the question, from what date? From the date of the November 24, 2010 publication, or from the January 13, 2011 publication?) after which people can only send letters to the DEA asking them to look at science, not bypass it.  Then the DEA can make its decision which by its terms is "not

---

[8] Most states have legislation that allows them to parrot the DEA's scheduling of "Controlled Substances" without any independent scientific inquiry or analysis.

subject to judicial review" and in reality  is an encroachment against the American Justice System, the United States Constitution and  the dream of a just society which children, just last week in Tucson, were encouraged to pursue.

It is only the Courts which are left to protect us from government action (albeit labeled "temporary") that will cause great havoc based upon the opinion of a single (although highly placed) individual.

The government's dictum, that Plaintiffs must wait until a year to a year and a half goes by for the DEA to "investigate" whether or not the lawful substances are actually harmful to humans (when used in a way contrary to how they are being sold), before taking that future record before a Court of Appeals, denies Due Process to citizens now; and should be rejected.

### (ii) Questions in the instant case implicit in the discussion of whether the case is "ripe" for judicial intervention

(1)    IS THE DOJ/THE DEA IMMUNE FROM COMPLYING
          WITH PRESIDENTIAL EXECUTIVE ORDERS?

The government did not comply with Executive Order No. 12866; watered down by the Bush Administration through amendments which amendments were then revoked by President Obama.  Instead the government claims that the true science is not yet relevant (Defendants' brief at fn 12, p.15)

(2)    IS THE DOJ/THE DEA IMMUNE FROM HAVING TO
        FOLLOW OTHER CONGRESSIONAL ACTS IMPLEMENTED
      TO PROTECT AMERICAN CITIZENS AND THEIR LIVELIHOOD?

The Regulatory Flexibility Act (RFA), 5 U.S.C. sec. 601,  requires a federal agency to prepare a regulatory flexibility analysis and assessment of the economic impact

of a proposed rule on small business entities, unless the agency certifies that the proposed

rule will not have a significant economic impact on a substantial number of small entities,

and **provides a factual basis for that certification**.  When an agency is required to

publish general notice of proposed rulemaking, the agency **_must_** prepare **_the initial_**

**_regulatory flexibility analysis_**, which must be published in the Federal Register. 5 U.S.C.

603 (a).  Failure to comply with the RFA may be grounds for overturning the rule**.**

_Cement Kiln Recycling Coalition v. E.P.A._, 255 F. 3d 855 (D.C. Cir. 2001).

The **_initial regulatory flexibility analysis_** published must described the impact of

the proposed rule on small entities and discuss "significant alternatives"  that accomplish

the regulatory objectives while minimizing any significant economic impact of the

proposed rule on small entities.  5 U.S.C.  sec. 603 (a), (c). A final regulatory flexibility

analysis must accompany the final rule.

On January 13, 2011, the DEA, which for the past two months has acknowledged

that its Notice of Intent to temporarily place five synthetic cannabinoids into Schedule I

of the Controlled Substances Act, **_is_** subject to the Regulatory Flexibility Act, "corrected"

its purported "administrative errors" contained in its November 24, 2010 Notice of Intent.

The DEA previously asserted that its rulemaking was drafted in accordance with the

Regulatory Flexibility Act, had reviewed the regulation, and claimed that the regulation

will not have a significant economic impact on a substantial number of small entities

(which is wrong).  The DEA now reversed its position about the RFA and asserts that the

provisions of the RFA have no application to temporary scheduling orders issued under

21 U.S.C. 811 (h) or to notice of intention to issue such orders.

The RFA applies whenever an agency is required to publish a general notice of

proposed rulemaking for any rule, or when an agency promulgates a final rule.   In this

case, the agency has published a notice of proposed "temporary" rulemaking.

Notice and Comment rulemaking is required under 5 U.S.C. sec. 553.  Any claim

of exemption from the rulemaking requirements under this section are to be narrowly

construed and only reluctantly countenanced.   *Rosas v. Brock Coalition for Parity, Inc*.,

709 F. Supp. 2d 10 (D.D.C. 2010).  The claim in this case is particularly suspect because

the timing suggests that it simply is a tactic in response to the recently articulated valid

position of Plaintiffs that the requirements of the Regulatory Flexibility Act have not

been met.  Administrative rulemaking requirements cannot be summarily disposed of by

calling a rule a "temporary placement of substances  into the Controlled Substances Act"

or "temporary scheduling order."

In *Rosas* ,supra, several agencies issued requests for information about health care

rules, followed by an interim rule.  They argued that they had express statutory authority

to promulgate interim final rules.  Managed health care organizations challenged the

agencies' disposal of the rulemaking process.  The Court noted that the statutory

provisions authorizing interim rules did not mention notice and comment or any other

aspect of the Administrative Procedure Act (APA).  The authority to promulgate interim

rules was permissive and without deadlines.  It didn't matter that the agencies thought it

would take significantly longer than one year to draft a final rule.  The agencies were not exempt from the requirements of 5 U.S.C. sec. 553.

The "good cause" exception to notice and comment rulemaking (5 U.S.C. sec. 553(b)) is to be narrowly construed and rarely accepted—exceptions are "indeed rare." *Ibid*.  Congress has not expressed a clear intent to abandon normal rulemaking procedures in this matter.  Plaintiffs have no need for regulatory guidance as they are not acting in violation of the law.  Plaintiffs have been selling an admittedly lawful substance, clearly labeled "not for human consumption" for years.  Defendant argues that Plaintiffs have no property interest in their business.  That is like saying that there is no property right in selling catnip because it's "like" marijuana.  Or a glue manufacturer has no property right in selling glue because it can be sniffed and abused.  Or an alcohol distributor has no property right in his business because alcohol frequently is misused, resulting in documented injury and death.

At first (erroneously) proclaiming that there was less than $100 million in commerce impacted annually, and only a few small business would suffer extinction based on the anecdote-based speculation of a DEA bureaucrat, Defendants now claim that those Congressional Acts requiring Congressional oversight don't matter.  Instead, focusing entirely on the opinion of the single individual bureaucrat, Defendants say "the science doesn't matter."  There is much at stake in addition to property rights and the ability to make a living.  Plaintiffs have a right to be free from hasty and arbitrary government interference, and to be free from prosecution , and from having their lawful

customers prosecuted, without being afforded meaningful Due Process of Law before they have to try to collaterally attack a "temporary rule" from behind prison walls.

As Defendants admit, the products in question have existed for 30 years. Defendants cannot link the products to any death. They cannot link the products to any physical damage. They cannot link the products to any lasting psychological damage. All that is offered is vague anecdotes. There is no proof of "imminent" danger caused by the products being sold.[9] If there were, why hasn't the DEA acted sooner?

Defendants pointed to the media-fed and politically driven hyperbole which allows people to claim that they are "tough on crime" without a single, consistent scientific study. Defendants have had years to gather toxicology reports from the patients they say have gone to the E.R. to determine whether they are being truthful about what has caused their varied (and non-similar) "symptoms" ranging from seizures to spiking blood pressure, none of which occur when humans consume marijuana. It is equally likely that these person have consumed  other illegal drugs but, when asked, do not voluntarily offer up their felonious behavior, but "default" to blaming everything upon a legal product they may, or may not, have used.

---

[9] The DEA cites reports from Poison Control Centers. The American Association of Poison Control Centers, on their website, indicate there were 4,200,000 calls they received in 2009 and the numbers are rising. In 2010 they received 2,772 calls about "synthetic marijuana", representing 0.066% of calls and they indicated opposite symptoms to that occurring with marijuana. See.
http://www.aapcc.org/dnn/Portals/0/K2releasedec21.pdf

Any legal product can be "laced" into an illegal harmful substance. That does not make the "laced" legal benign product something that must be outlawed.

It is important to solicit public information, including reliable scientific evidence, before developing proposed rules. A bureaucrat's assertion that disposing of standard rulemaking procedures is "necessary" is simply a conclusory and meaningless claim. The agency must actually demonstrate, not recirculate rumor, that there is exigency constituting the exceptional circumstance of "good cause*." Oregon Troller Ass'n. v. Gutierrez,* 452 F. 3d 1105 (9th Cir. 2006). Once Plaintiffs' businesses are destroyed by "temporary" scheduling orders, and particularly during this recession, there will be no recovery for Plaintiffs. For Plaintiffs, the "temporary" order is a final order, sounding the death knell for small businesses. Currently Plaintiffs are legally selling the products, and collecting tax on the sales for the government. Any person who misuses the product, like alcohol or similar legal substances can be misused, has no motive to conceal use of the legal substance, and is most likely to get appropriate treatment for his/her misuse of the product.

The authority of the government to engage in "temporary scheduling" of the substances in question, under 21 U.S.C. sec 811 (h)(6), is permissive and not mandatory, which is significant in the analysis.

The government points out that 21 U.S.C. sec. 811(h) was passed to allow the DEA to respond quickly to protect the public from drugs that appear in illicit traffic too rapidly to be handled effectively under the normal rulemaking procedures. At the same

time, the agency's Notice of Intent to schedule the synthetic materials in question states, on p. 2 ("Supplementary Information"):  "Synthetic cannabinoids have been developed over the last 30 years…"  The author of the Notice appears to be drawing unscientific conclusions based on "self-reporting" on "Internet discussion boards."  There is an assertion of "potential" health problems resulting from use, but no specific harm is articulated.  The Notice merely contains several generalized hearsay statements that some unknown number of people have been affected in various general ways by the product.  The Notice indicates that 15 states have controlled one or more of the synthetic substances, ***which illustrates that there has been time to follow normal rulemaking procedures.***

The federal Congressional Review Act imposes a further delay on the operative date of certain federal rules deemed "major." [10] The Act provides that major rules will take effect only after a specified period of time, typically no longer than 60 days after Congress has had an opportunity to review the rule and decides not to disapprove it.  Despite the statutory language indicating that the delayed date is when the rule will "take effect," it has been held that the Act does not change the date on which the rule becomes effective, but rather only affects the date when the rule becomes operative. In other words, the Act merely provides for a 60-day waiting period before the agency may enforce the major rule so that Congress has the opportunity to review the regulation.

---

[10]  Involving more than $100 million dollars of commerce

(3)     SHOULD THE DOJ/DEA BE ALLOWED TO BYPASS
TRADITIONAL CONSTITUTIONAL ANALYSIS AND SPECIFIC
POST *TOUMBY* LEGISLATIVELY CRAFTED STEPS BEFORE
A CITIZEN BECOMES A FELON?

The Controlled Substance Analogue Enforcement Act of 1986, 21 U.S.C.A. § 802,

provides that, to the extent that a controlled substance analogue is intended for human

consumption, it is to be treated as a schedule I controlled substance for purposes of any

federal law. The Act was designed to combat the problem of persons who seek to avoid

the reach of federal criminal drug laws by manufacturing or distributing substances that

are not listed as controlled substances, but which are specifically designed to provide

effects that are substantially similar to the effects of listed substances.

(4)     IS AN "INTELLIGIBLE PRINCIPLE" ONE THAT MUST BE
FOLLOWED, OR MERELY REGURGITATED AS A PRELUDE TO
GOVERNMENTAL ACTION THAT DEPRIVES CITIZENS OF THEIR
FREEDOM AND DESTROYS THEIR BUISNESSES AND DEPRIVES
THE STATES OF SALES AND BOTH FEDERAL
AND STATE GOVERNMENT OF INCOME TAX?

As Justice Thomas has pointed out, the Supreme Court has dealt with the

separation of powers argument inherent in delegation of legislative powers to

bureaucratic agencies since 1928 utilizing the principle of "intelligible principles".   That

concept was repeated in Touby.   However, 10 years later . In ***Whitman v. American***

***Trucking Associations*** 531 U.S. 457, 121 S.Ct. 903 U.S., 2001, Justice Thomas, noting

that the decisions of the Supreme Court have strayed from the intent of the Founding

Fathers when they wrote the Consitution, has invited a challenge to the practice, which in

its execution has crossed the line.

The action of the DEA, using 21 U.S.C. Section 811 (h) in the instant case, without bothering to even collect scientific data much less address the defined "problem" through the Analog Act, has crossed the line.   The DEA is legislating, without affording citizens Due Process of the Law, in violation of the Separation of Powers, and must be stopped.

(5)    DID THE ISSUE BECOME "RIPE" 30 DAYS AFTER PUBLICATION BECAUSE AT ANY SECOND, THE DEA CAN DESTROY THE PLAINTIFFS, INSTANTENOUSLY TURNING THEM INTO FELONS?

The trigger is cocked, but what is missing, is sufficeient scientific evidence to back up the claim that substances the DEA has labeled "Synthetic Cannabinoids" actually produce the mood-altering effect of  Delta 9 Tetrahydrocannabinol, the psycho-active ingredient in marijuana.   Such a leap of faith, based on self-reports, newspaper stories and internet postings flies in the face of all of the scientific research (much of which is funded by the federal government) published today.   "Keeping up with the Jones'" is not affording Due Process to citizens of the United States.

(6)    WHAT IS AN "IMMINENT HAZARD" TO PUBLIC SAFETY?

Oddly,  the statute under which the DEA is proceeding does not define the keystone of their action . Neither is that definition found within the United States Code relating to Controlled Substances.  In plain parlance, "imminent hazard" pertains to any activity or situation that is likely to result in serious injury, death, or significant environmental or property damage.

Notwithstanding the hyperbole of bloggers, not even the DEA is claiming that any of the five substances they intend to place within Schedule 1 causes death, or serious injury; instead they repeat stories told by unknown persons ( untested by any scientific evidence such as blood tests) that an unknown number of persons have allegedly suffered (from the products proposed to be banned, or "associated products" ) an unspecified degree of agitation, anxiety, vomiting, tachycardia, elevated blood pressure, seizures, hallucinations and non-responsiveness. Most of these temporary effects are caused by dreams, too.  Furthermore, those "symptoms" are not associated with marijuana.  The question arises:  what are these people actually taking?  To the extent some people may show up at a medical center with such symptoms, is it more likely that the symptoms are because they have underlying mental illnesses or have engaged in illegal drug use and are "blaming" something  for which they believe they can't be put into prison if they admit to being exposed to it?

(7)   IF THE DEA IS GOING TO ISSUE A "FINAL TEMPORARY" RULE, WITHOUT SCIENTIFIC BASIS AND WITHOUT ALLOWING DUE PROCESS OPPORTUNITIES TO BE HEARD, TO CHALLENGE EVIDENCE AND HAVE DECISIONS MADE BY AN IMPARTIAL FACT-FINDER  SHOULDN'T THEY BE REQUIRED TO PROVIDE A GRACE PERIOD FOR LEGAL CHALLENGES OR ARE THEY TRULY ABOVE CONGRESS AND THE PRESIDENT AND THE AMERICAN PEOPLE?

The DEA answers the above question "no";  if, and when that day arrives when a notice appears in the Federal Register, everyone who disobeys their edict (or who hadn't somehow gotten rid of the allegedly "hazardous" product) the DEA (and other law enforcement agencies) will then be free to arrest and prosecute; and those persons would

then have the burden of proof to establish that what they possessed shouldn't have been

placed into Schedule 1;  from behind the bars of a jail cell.   We are not the former Soviet

Union, nor the Government of South Africa.   Our citizens should not be forced to write

about their oppression while incarcerated.   They should first have the ability to prevent

the incarceration through the orderly process of American justice.   There must be an

opportunity to be heard, an opportunity to challenge "evidence" and present real

scientific data, and then a decision can be made by an impartial fact-finder.

## III.

## CONCLUSION

It is time to revisit the holding and the reasoning in *Touby.*   The Court which

decided that case did not consider the lack of Due Process of Law; it merely relied upon a

60 year old mantra, that "an intelligible principle" could usurp the separation of powers,

even if it was uttered without proof.   Congress has already acted to make unnecessary

the antiquated "special procedure" the DEA is utilizing through the adoption of the

Analogue law, a statute that did not figure into the rationale of the *Touby* court which was

struggling with a problem already solved, but not before it.   Delegation of Power is one

thing, abuse of power is another.

Under the facts of the case at bar, where lawful Americans have sold, for many

years, lawful products, collecting sales tax, paying income tax, and warning customers

about hazards associated with the misuse of their product, they should not be turned into

felons, along with their customers, wrecking havoc upon an industry involving more than

$100,000,000.00 of dollars in interstate commerce,  putting thousands of people out of work when there already exist laws to address the problems imagined by the DEA.

The "process that is due" is one where independent scientists, using established principles of research,  identify real hazards, as opposed to relying upon rumors whipped up by hysterical bloggers and politicians playing to fear abetted by reporters  hyping stories with catchy phrases such as "fake pot".  Neither the "war on drugs" or the "culture wars" justify the abandonment of  the Constitutional protections so many Americans have died fighting to protect.  The separation of powers and due process of law, principles upon which our country was founded, has not become "outmoded" by the passage of time, nor by crafty chemists, nor should it be, to paraphrase Judge Robertson from the D.C.Circuit:  In this case, the Court is asked to decide whether a maneuver by the Executive Branch deliberately designed to outfox a  clear directive of Congress should be successful. The answer should be no.

Respectfully submitted this 18th day of January, 2011

**Kurzman Grant Law Offices**

By:   __s/b Marc G. Kurzman_____
        Marc G. Kurzman, # 59080

        ___s/b Carol Grant_____
        Carol Grant, #0036870

***Attorneys for Plaintiffs***
219 Main Street, S.E., Ste. 403
Minneapolis, MN 55414
612. 617.9000 (Tel)
612. 617.9009 (Fax)